PEOPLE ex rel. WILLETT v. QUINN, Sheriff. PEOPLE ex rel. CASSIDY v. SAME. PEOPLE ex rel. WALTER v. SAME.

(Supreme Court, Appellate Division, Second Department. May 17, 1912.)

1. CRIMINAL LAW (§ 211*)—PRELIMINARY PROCEEDINGS—SUFFICIENCY OF INFORMATION.

The information in proceedings before a magistrate must state facts showing that informant has reasonable grounds to believe that a crime has been committed by some person named or described therein.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 420–430, 431; Dec. Dig. § 211.*]

2. HABEAS CORPUS (§ 26*)—PURPOSE OF WRIT.

If the information filed before a magistrate charging one with a crime does not show reasonable grounds to believe that a crime has been committed by the person charged, so that the subpœnas are void, relieving witnesses from obeying them, habeas corpus is a proper remedy to prevent the punishment of such witnesses for disobeying the subpœnas, and the person charged would also be entitled to the writ if, when the warrant of arrest was issued, the evidence did not show reasonable ground to believe that a crime had been committed by him.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 13, 21; Dec. Dig. § 26.*]

3. HABEAS CORPUS (§ 25*)—PRELIMINARY HEARING—COMMITMENT.

If when the examination on an information before a magistrate was completed, including the hearing of the person charged, there was sufficient cause to believe that he was guilty of the offense charged, the mag-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

istrate's commitment could not be afterwards attacked on habeas corpus because at a prior stage of the proceedings the magistrate had exceeded his jurisdiction or the proofs were insufficient.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 21, 28, 30, 47; Dec. Dig. § 25.*]

4. CRIMINAL LAW (§ 207*)—PRELIMINARY HEARING.

The fact that a grand jury was in session at the time a hearing was had on an information filed before a magistrate did not affect the magistrate's jurisdiction to conduct the examination and issue a commitment; it being for the district attorney to decide whether a preliminary examination should be conducted before the magistrate or the case submitted to the grand jury.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 414, 418, 440, 472–475; Dec. Dig. § 207.*]

5. CRIMINAL LAW (§ 230*)—PRELIMINARY PROCEEDINGS—EXAMINATION BEFORE MAGISTRATE—PUBLIC EXAMINATION.

Code Cr. Proc. § 205, requires a magistrate or his clerk to keep the depositions taken on an information charging an offense, or on the examination and statement of accused until they are returned to the proper court, and forbids their inspection by any one except a judge of a court having jurisdiction of the offense, the Attorney General, district attorney, accused and his counsel, and complainant and his counsel. Section 202 authorizes the magistrate to cause the witnesses to be kept separate until they are all examined. Section 203 provides that the magistrate may also exclude from the examination "every person" except the magistrate's clerk, prosecutor, and his counsel, the Attorney General, district attorney, accused and his counsel, and the arresting officer, and section 204 provides for the taking of testimony by deposition. Held, that a commitment was not void because the examination of the people's witnesses was conducted in public rather than in private.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 461, 478, 484, 485; Dec. Dig. § 230.*]

6. CRIMINAL LAW (§ 240*)—PRELIMINARY EXAMINATION.

Under Code Cr. Proc. § 208, providing that if it appears from the examination before a magistrate that a crime has been committed, and there is sufficient cause to believe the defendant guilty, the magistrate must indorse on the depositions and statement an order holding defendant to answer, it is only essential when the commitment was issued that it should appear from the depositions, examination, and defendant's voluntary statement that a crime had been committed, and that there was sufficient cause to believe defendant guilty thereof, and it is immaterial that informant was actuated by improper motives, such as malice, revenge, etc.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 495–500; Dec. Dig. § 240.*]

7. HABEAS CORPUS (§ 85*)—COMMITMENT—SUFFICIENCY OF EVIDENCE.

Evidence on habeas corpus to procure the release of persons charged with having fraudulently given and accepted money to affect the result of a judiciary convention held to sustain a finding of reasonable cause to believe that defendants committed the crime charged.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 77, 78; Dec. Dig. § 85.*]

Appeal from Special Term, Queens County.

Habeas corpus by the People, on the relation of William Willett, Jr., on the relation of Joseph Cassidy, and on the relation of Louis T. Walter, Jr., against Thomas M. Quinn as sheriff of Queens county. From final order dismissing the writs in each proceeding, relators ap-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

peal.  Order in Cassidy Case reversed, writ sustained, and relator dis-
charged, and orders in the other cases affirmed.

Argued before JENKS, P. J., and HIRSCHBERG, WOOD-
WARD, BURR, and RICH, JJ.

Mirabeau L. Towns, of New York City (William Willett, Jr., of
New York City, on the brief), for appellants.

Fred G. De Witt, of Long Island City, for respondent.

BURR, J.  On November 21, 1911, Mr. Justice Scudder, sitting
as a committing magistrate, issued his warrant for the arrest of Wil-
liam Willett, Jr., upon a criminal charge of fraudulently and wrong-
fully committing certain acts therein specified, tending to affect the
result of the judiciary convention held in and for the Second Judicial
Department on the 6th day of October, 1911.  On the same day war-
rants were also issued for the arrest of Joseph Cassidy and Louis T.
Walter, Jr., upon similar charges.  Prior thereto, and on various dates
between November 2, 1911, and the date of issuing said warrants,
various persons had appeared before Mr. Justice Scudder, either vol-
untarily or in response to the requirements of a subpœna signed by
him, and had been examined, their testimony had been reduced to
writing and signed, the depositions had then been sworn to before him
and filed with him.  On November 27, 1911, the relators voluntarily
appeared before said magistrate, waived the reading of the deposi-
tions taken before him prior to the issuing of the warrants, and de-
manded an examination.  On December 5, 1911, the date fixed by
consent for such examination, they again appeared in person or by
counsel, and thereupon stipulated that the depositions of the several
persons which had been taken prior to the issuing of said warrants
stand as their testimony, with the same force and effect as if such
witnesses had been sworn, and had thus testified upon such examina-
tion.  Counsel for the accused then cross-examined three of the per-
sons who had been previously examined and had made depositions,
and stated that he did not desire that either of the other persons
whose depositions had been taken should be produced for examina-
tion.  Thereupon each of the accused made a statement to the magis-
trate, as permitted by section 196 of the Code of Criminal Procedure.
The proceedings were thereupon adjourned by consent to December
11, 1911, upon which date the magistrate decided that a crime had
been committed, and that there was sufficient cause to believe that
the accused were guilty thereof, and thereupon issued to the sheriff
of Queens county a commitment directing him to receive and retain
in his custody the said William Willett, Jr., to answer to the grand
jury of Queens county upon a charge of "fraudulently and wrong-
fully offering, tendering, and paying a cash consideration to one Louis
T. Walter, Jr., for the purpose of affecting the Democratic Judicial
Convention of the Second Department, held on October 6, 1911, pay-
ing money to Louis T. Walter, Jr., delegate to said convention, for
the purpose of inducing said Walter to vote at said convention for
the said Willett, and conspiring together with Louis T. Walter, Jr.,
and Joseph Cassidy to promote the nomination and election of him,

the said William Willett, to the office of Justice of the Supreme Court, Second Department, state of New York, on October 6, 1911, by means which are prohibited by law, to wit, payment and receipt of cash consideration, requesting and accepting the nomination as Justice of the Supreme Court of the Second Department on the payment or contribution by him of a sum of money to one Louis T. Walter." A similar commitment was issued in the case of Louis T. Walter, Jr., containing a recital that he was held "upon a charge of fraudulently and wrongfully receiving money from one William Willett before the Democratic Judiciary Convention of the Second Department, held on October 6, 1911, upon the agreement and understanding that he, said Louis T. Walters, Jr., should vote for the said William Willett in such convention, conspiring together with William Willett and Joseph Cassidy to promote the nomination and the election of William Willett as a Justice of the Supreme Court, Second Department, by means which are prohibited by law, to wit, payment and receipt of money, and procuring or causing the said William Willett to be nominated to the office of Justice of the Supreme Court for the Second Department of the state of New York upon the payment of contribution by said Willett to him of a sum of money." A similar commitment was issued in the case of Joseph Cassidy, containing a recital that he was held to answer "upon a charge of conspiring together with William Willett and Louis T. Walter, Jr., to promote the nomination and election of the said William Willett to the office of Justice of the Supreme Court for the Second Department, state of New York, by means which are prohibited by law, to wit, payment and receipt of a cash consideration, tendering and offering to procure and causing the nomination of William Willett as a nominee for the office of Justice of the Supreme Court upon the Democratic ticket for the Second Department as aforesaid upon the payment or contribution of a sum of money, or upon an understanding or promise thereof." Thereupon each of the persons named sued out a writ of habeas corpus before a justice of this court; and from a final order in each of said proceedings, dismissing said writ and remanding the relator therein to the custody of the sheriff, these various appeals are taken.

The validity of the commitments is challenged upon three grounds:

(1) That the magistrate was without jurisdiction to issue the same (a) because the deposition presented to him on or about November 2d, whether properly termed an information or by whatever name described, designated no crime and charged no person with the commission thereof, and therefore the subpœnas issued by him were void; (b) because at that time a grand jury was in session in the county of Queens, and the district attorney of the county might have presented to such grand jury the same evidence which was submitted to Mr. Justice Scudder as a magistrate.

(2) That the examination of the witnesses whose testimony was reduced to the form of depositions and sworn to, and which constitute the basis of the several commitments, was taken in public, and not in private.

(3) That the evidence before such magistrate was not sufficient to justify him in concluding either that any crime had been committed, or that either of the defendants had been guilty of the crimes with which he was charged.

"When an information is laid before a magistrate, of the commission of a crime, he must examine on oath the informant and prosecutor, and any witnesses he may produce, and take their depositions in writing, and cause them to be subscribed by the parties making them." Code Crim. Proc. § 148. "A magistrate, before whom an information is laid, may issue subpœnas, subscribed by him, for witnesses within the state, either on behalf of the people or of the defendant." Code Crim. Proc. § 608.

[1] In such information facts enough must be stated to show that the informant is acting in good faith, and that he has reasonable grounds to believe that a crime has been committed by some person named or described. People ex rel. Livingston v. Wyatt, 186 N. Y. 383, 79 N. E. 330, 10 L. R. A. (N. S.) 159, 9 Ann. Cas. 972. If such is not the case, then the subpœnas issued are void, and the witnesses summoned are under no obligations to obey the same.

[2] If under such circumstances an attempt should be made to punish them for disobedience, an adequate remedy may be obtained by them through the writ of habeas corpus. People ex rel. Livingston v. Wyatt, supra. Whether at the instance of the persons affected thereby a writ of prohibition would issue to prevent the issue of such subpœnas and the examination of witnesses thereunder we need not determine. See People ex rel. Fleming v. Mayer, 41 Misc. Rep. 289, 84 N. Y. Supp. 71. No application was made for such relief. The objection now under consideration has ceased to be of any importance for reasons hereinafter stated. So, if at the time when the warrant of arrest was issued the evidence contained in the depositions was insufficient, relators were not obliged to wait for an examination, but could immediately apply for a writ of habeas corpus for their protection. People ex rel. Perkins v. Moss, 187 N. Y. 410, 80 N. E. 383, 11 L. R. A. (N. S.) 528, 10 Ann. Cas. 309. No application was made for such relief. On the contrary, relators appeared, participated in cross-examining the people's witnesses, and made a statement. If, when the examination was finally completed, and after hearing the statement of the defendants, it then appeared that the crime mentioned in the depositions or any other crime or crimes had been committed, and that there was sufficient cause to believe the defendants guilty thereof, the magistrate had jurisdiction to hold them to answer for the action of the grand jury. Code of Crim. Proc. § 208.

[3] The commitments cannot thereafter be successfully attacked because at some prior stage of the proceeding the magistrate may have exceeded his jurisdiction or the proofs were insufficient.

[4] So, too, the fact that a grand jury was in session at the time that the proceedings were had did not oust the magistrate from jurisdiction to consider the information, examine witnesses, take their depositions, proceed with the examination, listen to the statements of the accused, and issue his commitment. In the larger counties of

the state, particularly in New York and Kings counties, there is one or more grand juries in session during every month in the year, and yet a large number of magistrates are busily engaged every day in conducting preliminary examinations as to the commission of crime. It would be utterly impossible for a district attorney in the larger counties of the state to conduct the business of his office if whenever a grand jury was in session he was obliged in the first instance to present evidence as to crimes which might be prosecuted by indictment to that body only. It must be left to his discretion to determine in which way he will proceed.

Nor is there anything in the suggestion that the district attorney may again present the evidence to a future grand jury, and if an indictment is found, followed by conviction, the sufficiency of the evidence to show a crime may be reviewed on appeal from the judgment. It is not the district attorney, but the relators, who are "seeking a preliminary review by appeal of the question whether a crime has been committed."

[5] Nor are the commitments void because the examination of the witnesses for the people was conducted in public rather than in private. It is true that the statute provides that:

"The magistrate or his clerk must keep the depositions taken on the information or on the examination, and the statement of the defendant, if any, until they are returned to the proper court; and must not permit them to be inspected by any person, except a judge of a court having jurisdiction of the offense, the Attorney General, the district attorney of the county, the defendant and his counsel and the complainant and his counsel." Code Crim. Proc. § 205.

Literally construed, this prohibition relates to the depositions, when complete, and the statement made by the accused, and not to the examinations which resulted in such depositions, or the information itself. People ex rel. Fleming v. Mayer, supra. Whether the examination shall be conducted secretly or in public would seem to be within the discretion of the magistrate, except that certain persons may not be excluded therefrom. Code Crim. Proc. §§ 202, 203. Counsel for the relators, with great earnestness and eloquence, has sought to impress upon the court the indirect injury that might result by reason of an unfounded charge made against a candidate for a public office, in the heat of a political campaign, and the public examination of witnesses in an attempt to support the same; and he has asserted that these proceedings were not taken in good faith, and that the informant was actuated by ulterior motives, and, when he laid the information before the magistrate, had no reasonable ground to believe that a crime had been committed. If the accused were seeking by a writ of prohibition to restrain the magistrate from proceeding without jurisdiction, or in excess of his jurisdiction, in conducting public examinations of witnesses after an insufficient information, motive and good faith might be questions of importance.

[6] But upon a habeas corpus to review a commitment issued after an examination completed and depositions filed, and a voluntary statement by the accused, the fact that the informant may have been actuated by motives of malice, hatred, or revenge, rather than those

of pure patriotism, or may have been seeking to accomplish some ulterior purpose, political or otherwise, rather than the prevention or punishment of crime, is not material. Did it appear at the time when the commitments issued from the depositions, the examination, and the voluntary statements of the defendants that a crime had been committed, and that there was sufficient cause to believe the defendants guilty thereof? That is the only question in these cases. Code Crim. Proc. § 208; People ex rel. Bungart v. Wells, 57 App. Div. 140, 68 N. Y. Supp. 59. "If two or more persons conspire to commit a crime; or   *   *   *   commit any act injurious to public morals *   *   *   each of them is guilty of a misdemeanor." Penal Law (Consol. Laws 1909, c. 40) § 580, subds. 1, 6. "Any person who *   *   *   fraudulently or wrongfully does any act tending to affect the result of any election at a political caucus or of any primary election or convention" or "directly or indirectly, by himself or through any other person, pays, or offers to pay, money or other valuable thing,   *   *   *   to any person, to induce any voter to vote, or refrain from voting, at a political caucus, primary election, or convention, for or against any particular person; or   *   *   *   by menace or other unlawful or corrupt means, directly or indirectly, influences or attempts to influence, the vote of any person entitled to vote at a political caucus, primary election, or convention,   *   *   * or directly or indirectly, by himself or through any other person, receives money or other valuable thing   *   *   *   before, at, or after any political caucus, primary election, or convention, for voting or refraining from voting for or against any person   *   *   *   at a political caucus, primary election, or convention   *   *   *   is guilty of a misdemeanor." Id. 751, subds. 5, 7, 8, 9. "Any two or more persons who conspire to promote   *   *   *   the election of any person to a public office by the use of any means which are prohibited by law, shall be punishable by imprisonment for not more than one year; provided any act besides such agreement be done to effect the object thereof by one or more of the parties to such conspiracy." Id. § 773. The several commitments contain recitals of a violation by the persons named therein of one or more of these provisions of the Penal Law. Is there sufficient evidence thereof to justify such recitals?

[7] The acts and conduct of the relators Willett and Walter are so connected and interwoven that these may be considered together. The relator Cassidy occupies a different position. A careful examination of all the evidence taken before the magistrate fails to disclose any connection upon his part with any criminal acts or conduct. Giving to such evidence the fullest possible effect, nothing further appears than that, occupying the position of a powerful political leader in the county of Queens, after one or more consultations with the relator Walter, he concluded to exercise his influence over the delegates to the Democratic Judiciary Convention favorably to the nomination of the relator Willett. Whether he was led so to do from motives of friendship to either Walter or Willett, or out of gratitude for supposed support from one or both of them at the preceding

primaries, or because he supposed that his own political fortunes would be subserved thereby in the future, or because he actually believed Willett to be the most worthy candidate for the position, does not appear. But we have been unable to discover any evidence which would justify the conclusion that he was influenced so to do by the payment or offer of payment of money or any other valuable thing, or that he resorted to menace or other unlawful or corrupt means to influence or attempt to influence the vote of any of the delegates to said convention. In his case the order should be reversed, the writ sustained, and he should be discharged. We are of the opinion, however, that in the case of the relators Willett and Walter the orders should be affirmed.

It is impossible within the limits of an opinion to review exhaustively all of the evidence in these cases, contained in nearly 800 printed pages. These salient facts appear: On September 26, 1911, primaries were held in Queens county for the election of delegates to the Democratic Judiciary Convention to be held on October 6th. Three persons were to be nominated at such convention. Prior thereto it was agreed by the political leaders of the various counties in the judicial district that two of such nominations should be accorded to Kings county, and the remaining one to Queens county. The combined votes of the delegates from Kings and Queens counties constituted a majority of all of the delegates to such convention. Louis T. Walter, Jr., a prominent and influential politician, was one of the delegates elected from Queens county, and at the convention he presented the name of William Willett as a candidate for the office of Supreme Court Justice, and he was nominated. Although the names of several prominent members of the bar in Queens county had been mentioned in connection with the nomination for that office for several weeks prior to the date of the convention, it affirmatively appears that Willett's name had never been discussed by many of those who would presumably be of influence in connection with such nomination until just before the convention, when Walter became his active advocate with Cassidy and others, who were supposed to exercise great influence over the members thereof. On the 22d of September, four days before the primaries were held, Willett borrowed $5,000 on his note, indorsed by Frank R. Merrill, payable one month from date. This note was discounted at the Fifth National Bank in New York, which was the bank where Merrill kept his account. The proceeds of this discount were given to Willett in bills of large denomination, either $500 or $1,000 in amount. On September 30th, four days after the primaries and six days before the convention, Willett presented for discount to the Far Rockaway National Bank, where he kept an account, two notes made by Marinus Willett, his brother, to his order and indorsed by him. One of the notes was for $2,500 and the other for $7,500. These notes were discounted, and the proceeds carried to William Willett's account. He asked to have the proceeds given to him in cash. The president of the bank testified that he found upon examination that he did not have that amount of cash at the banking house, but that

he gave him a draft upon the Seaboard National Bank in New York, which, upon the same day, was cashed by Willett, the amount being paid to him again in bills of the denomination of $1,000 each. Walter was in his company at that time. On October 6th, in the forenoon of that day, and about three hours before the meeting of the judiciary convention, Willett borrowed an additional sum of $10,000 from the Long Island Bank at Jamaica, which sum was also paid to him in bills of large amount. This loan was obtained upon his own note, and as collateral security for the payment thereof five shares of the stock of the Seaside Improvement Company were then deposited. The bank already had in its possession a second mortgage for $32,000 on lands at Rockaway Beach, which had been deposited with the bank some six months before as collateral security for a previous loan and which mortgage Willett had been trying to sell, and it was then agreed that said mortgage should be held as additional security for this new loan. It appears, therefore, that in less than two weeks before the convention was held Willett borrowed the considerable sum of $25,000. The fact that the whole of this large amount was paid to the borrower in cash is some evidence that the loans were not obtained for ordinary business purposes. As a rule, in the absence of proof of peculiar circumstances requiring it, if payments of any considerable size are to be made in liquidation of honest claims, or for business investments, debtors or purchasers prefer to pay by check rather than in cash, since the checks possess some value as evidence of payment. From the fact that each of these loans was obtained in cash one could justly infer that for some reason it was thought desirable by the borrower that the purposes for which the money was used should not be as easily traced as if checks were used. The testimony of Frost, the business partner of Willett, strengthens the conclusion that these sums were not borrowed for ordinary business purposes. But Willett took further precautions which tended to prevent these transactions from being known. The only security offered by him, which was of a character that might come to the notice of the public, was the assignment of the mortgage to the Long Island Bank. If this were recorded, attention might be called to the transaction, and in that connection we find Willett requesting that this assignment should not be recorded until three weeks after the election. Secrecy is not always nor alone evidence of guilt, but, taken in connection with other circumstances, it may have considerable probative force.

In this same connection it is important to notice that on October 16th, when the loan made on October 6th became due, Willett stated to the president of the Far Rockaway Bank that he desired an extension of that loan for the reason "that he could not pay the loan at the time because he did not want to sell anything or put it on record at the present time, because that would be confirmation of the story" that the newspapers were "going to publish about his buying the nomination." Just how he knew that such publication was to be made does not appear, for up to that time it had not been made, but it is the fact that two days later, and on October 18th, an article did ap-

pear in the Brooklyn Standard Union containing statements substantially to the effect that corrupt means had been employed to secure the nomination of one or more of the candidates named on October 6th by the said judiciary convention. When that article appeared, Willett's associates upon the ticket, Ketcham and Callahan, felt indignant at its publication in so far as it reflected upon them. A meeting of the three candidates was had to determine upon a plan of action, and the next day an information containing a charge of criminal libel against the publisher of that paper was made by them before a city magistrate in the borough of Brooklyn, and the publisher was notified to appear to answer. Willett's conduct upon this occasion is · significant. In conferring together as to any possible foundation for the article, each of his associates frankly and candidly stated what he had done in the way of pecuniary transactions in connection with his candidacy. One stated that he had contributed to the campaign fund of his party, before the convention met, the sum of $200, which was the same amount that in previous years he had been in the habit of contributing, and the other that he had contributed $100 in the same way, which was the same amount that he had contributed in previous years, except on one occasion when he had contributed nothing. Instead of being equally frank, Willett then stated to his associates: "There is nothing against me." The examination before the magistrate was adjourned. Before the adjourned day Willett seems to have learned that the cashier of the Long Island Bank had been subpœnaed as a witness on said examination. Thereupon, realizing that the truth was about to come out, he for the first time disclosed to his associates upon the ticket that on the morning of the convention he had borrowed $10,000 from the said bank in cash, represented by 10 $1,000 bills. Even then he did not disclose the other sums which he had borrowed from the other banks. The effect of this disclosure upon the trained legal minds of his associates upon the ticket was to call forth from one the expression that he was doubtful whether this indicated only "an indiscretion," as Willett claimed, or "a criminal act," and from the other the expression that "it will be mighty hard to explain that sort of a story," "that it was a very unsatisfactory explanation," and that there were "reasonable grounds" (for the article complained of) "as to Mr. Willett's matter." The proceeding for criminal libel against the publisher of the Standard Union was immediately withdrawn.

But still further evidence tending to show the character and purpose of Willett's transactions is found in the contradictory statements which he made at the time that he obtained these loans and subsequently thereto. When he obtained the first loan of $5,000 from the Fifth National Bank, through the accommodation of Merrill, he told him that "he wanted to make a contribution to the primaries" in the hope that he might be named as a candidate for Justice of the Supreme Court. Whether he actually made that contribution does not appear, but it does appear that when that note came due on October 23d, although it was nominally paid by the check of Marinus Willett, his brother, on the same day he borrowed from Merrill collateral

security in the shape of railroad stock to enable him to raise money to make this check good, which collateral Merrill retained as late as the 20th of November. On October 28th Willett made a statement in the public press that "within about the preceding thirty days" he had borrowed $20,000, and no more. Within 35 days he had borrowed $25,000, $5,000 avowedly to be used in connection with the primaries. In the same statement he said that of the $20,000 which he admitted that he had borrowed he had used $5,000 to take up a note due October 23d. It is a little singular that on September 30th he should borrow $10,000, and on October 6th $10,000 more, to enable him to pay a note which was not to become due until October 23d. And why should he have wanted to carry about large bills, with the danger of losing them, during all the time until this note became due, when a check would have been a safer and more convenient method of taking up the note? If the note which he says he paid on the 23d of October was the Merrill note above referred to, which was due on that day, his statement was manifestly false, for, as has been seen, he had not paid the same. That he did intend to refer to the Merrill note appears from his subsequent statement before the magistrate. Referring again to his statement made on October 28th Willett said that he did pay $5,000 in cash to Louis T. Walter, Jr., on September 30th. This was four days after the primaries, and six days before the convention. The alleged consideration for that payment I shall consider later. Substantially all of the rest of the money he claimed then to be in his possession. If so, why did he not redeposit in the bank the cash as matter of precaution, or why did he not take up the collateral which Merrill had loaned on the 23d of October to make good the check given to take up his note due on that day, and return such collateral to him? On the occasion when he sought to borrow $10,000 from the Far Rockaway Bank on the 30th of September, he told the president of that bank that he wanted it because "he had an opportunity to make quite some money," although he failed then or in his subsequent statements to show what that opportunity was. When he applied on October 5th to the president of the Bank of Long Island for a loan of $10,000 (and which loan was actually made to him on October 6th, the morning of the day upon which the convention met), he stated to him that he expected to be nominated for Supreme Court Judge, and wanted some money for that purpose. He stated that he wanted the money either that day (the 5th) or the next morning, because after he was nominated he could not spend any money, and "whatever he did towards contributions for campaign expenses would have to be done then." He further said to him that he "could not contribute to a campaign fund afterwards, and that he would have to contribute before the nomination." When he received the money in bills the next morning, Walter was again at the bank, waiting for him. They went away together in an automobile, and about three hours afterwards Walter placed him in nomination before the judiciary convention, and he was nominated. Subsequently he stated to various persons, including his associates on the ticket, that he did not obtain this money to contribute to the

campaign fund before the convention, but to use for his own personal advantage in sending circulars through the district, although it appears that he never did use this money or any considerable portion of it for that purpose, if his subsequent statements that as late as October 28th it was still in his possession were true. It may be that a petit jury, in the face of all this testimony, will say that the willingness of Willett to resort to corrupt and unlawful methods to secure his nomination, and the opportunities for so doing, are not established beyond a reasonable doubt. A committing magistrate is not required to exact the full measure of proof necessary to secure a conviction, but is obliged to hold one accused of crime for trial if there is "reasonable ground to believe him guilty." People ex rel. Fleischman v. Fox, 34 Misc. Rep..82, 69 N. Y. Supp. 545; People v. Steinhardt, 47 Misc. Rep. 263, 93 N. Y. Supp. 1026; Matter of Paul, 94 N. Y. 497, 503.

If the evidence is sufficient to establish Willett's guilty purpose within this rule, is there any evidence which under the same rule indicates that such purpose was carried into effect, and that he paid directly or indirectly any money or valuable thing to any person with a view to influence that person's vote in his behalf at the judiciary convention? On the morning of the day when the convention was held, when Willett obtained $10,000 in cash from the Long Island Bank, Walter accompanied him to the bank in an automobile, waited while he went in and got the money, and they rode away together. He had previously accompanied him to the Seaboard Bank when the sum of $10,000 was obtained, also in bills. Walter was then driven to the railroad station, shortly thereafter met Cassidy on the train, and half an hour before the convention met announced that Willett would be the candidate. Any inference that might be drawn from these circumstances of a corrupt payment of money is strengthened by the further fact that on October 2d, after the primary election at which Walter was elected a delegate, and four days before the convention met, Willett did pay to him upon the porch of his house out of the proceeds of the loan obtained by him from the bank at Far Rockaway the sum of $5,000 in bills, which payment was kept secret at the time, and a considerable portion of which money Walter retained in cash until after the convention had acted, and also by statements made by the latter at various times as to his purpose in so doing. On one occasion Walter stated that he was keeping it to play the races at Baltimore, and at another that he wanted to pay small amounts on various debts which he owed. Both Walter and Willett in various statements, made at different times to several people, attempted to explain the consideration for that payment. Statements made under such circumstances may be of such a character that the impression of guilt derived from the facts unexplained may be removed, or the statements may be so highly improbable and incredible as to result in ripening the impression into a conviction. Briefly, these statements were to the effect that this money was paid in consideration of the transfer by Walter to Willett of 63 shares of stock in a company known as the Automobile Building Company,

and 24 shares of stock in a company known as the Cabinet Land Company, at 50 cents on the dollar for the former and 75 cents on the dollar for the latter. Walter "had been nagging" Willett to buy this stock for a "month or six weeks" before, apparently without success. The certificates of stock were not given to Willett at the time that the money was paid, but, as is claimed, on the day before, on the railroad train; the transfer being indorsed in pencil. At the prices named the sum paid for the stocks should have been $4,950 rather than $5,000. These stocks had been delivered to Walter some time before, whether in 1909 or 1910 it is not clear, in return for services rendered by him in connection with a prior purchase of some of the stock by Willett from one Malone, although it would appear from the evidence that the services in connection therewith were rendered to Malone and for his benefit, rather than to Willett. The Automobile Building Company was organized to take a lease of a building in New York with a view of subletting the same. Walter, in the summer of 1911, had stated to Malone that he did not think that the stock was "worth very much." No cash had ever been invested in the company for which stock had been issued, although Willett and his brother and Frost, who was Willett's partner, had deposited with a surety company indemnity to induce them to give to the lessors a bond guaranteeing the payment of the rent. Walter seems to have taken little interest in the affairs of the company, had never seen the stockbook, and, when he made inquiries as to the business, had been told that it was in a bad way. Although an agreement had been made that $1/16$ of the salaries paid to the officers of the company in excess of a specified amount should be turned over to Walter, he never made any inquiries as to the amount of salaries paid, nor received any portion thereof. For a year after the acquisition of the Malone stock, it appeared that there was only one meeting of the board of directors which Walter attended, or of which he received any notice. The company had never paid any dividends. The relator Willett was the president of the company, his brother the vice president, and Halstead Frost the treasurer. Frost could not tell what the output of the company was during the preceding year, whether it was making or losing money, but it did appear that it was owing the firm of Willett & Frost for moneys advanced by them to meet the necessary running expenses a sum exceeding $12,000. Although it appeared that Walter had on previous occasions been pressed for money, and had endeavored to borrow money to meet his obligations, he had never attempted to make use of this stock as collateral. With regard to the Cabinet Land Company stock, it appeared that this company was organized to purchase vacant lots, and that it had purchased the same, subject to a large mortgage and accumulated taxes. None of its lots had ever been sold, and the stockholders, instead of receiving dividends, had been paying assessments to meet carrying charges. None of its stock had ever been sold. Walter did not know where the office of the company was located, nor who its officers were, and, although the other stockholders had paid five or six assessments to meet carrying charges, it does

not appear that Walter was ever called upon to pay any. In his statement of stocks that he owned just prior to these transactions, he made no reference to his stock in this company, although he did state that he owned 64 instead of 63 shares of the stock of the Automobile Building Company.

Of course, it is possible that the stock of each of these companies may have some prospective value, or may even be worth the sum which Willett asserts that he paid for the same. The question before the magistrate was this: Is there reasonable ground to believe that this alleged sale of stock in these two companies was an honest, bona fide transaction, or a mere cloak to cover the payment by Willett to Walter, corruptly made, with a view of securing Walter's influence and services in connection with Willett's nomination? We think that the latter conclusion was justified.

It may be possible that upon a trial before a petit jury many of these facts may be controverted, or, if not, that a jury may accept the story in its entirety as consistent with innocence, but the duty of the magistrate was clear to hold these defendants on such evidence for the action of the grand jury.

The order in the case of the People ex rel. Cassidy v. Quinn should be reversed, the writ sustained, and the relator discharged without costs. The orders in each of the other cases, dismissing the writs and remanding the relators, should be affirmed without costs.

JENKS, P. J., and RICH, J., concur. WOODWARD, J., concurs in separate opinion, with whom HIRSCHBERG, J., concurs.

WOODWARD, J. I concur in the result reached by the opinion of Mr. Justice BURR, but I do not wish even by silence to appear to assent to the view that the depositions of witnesses in a preliminary examination before a warrant is issued may be taken in public any more than they can be displayed to the public after they have been reduced to writing and signed.

Section 205 of the Code of Criminal Procedure provides that:

"The magistrate or his clerk must keep the depositions taken on the information or on the examination, and the statement of the defendant, if any, until they are returned to the proper court; and must not permit them to be inspected by any person, except a judge of a court having jurisdiction of the offense, the Attorney General, the district attorney of the county, the defendant and his counsel and the complainant and his counsel."

It seems to me that this provision could have had no possible purpose other than to secure secrecy for the preliminary proceedings on an information. When it is considered that at such stage of the proceedings no one has been charged with the commission of a crime and that it may be that as a result of the inquiry no one will be so charged, the importance of secrecy is just as manifest as in the case of proceedings before a grand jury. The relators in this case were subjected to the humiliation of a public exploitation of their private affairs just upon the eve of an election, in which the ambitions, perhaps, of a lifetime for one of them were involved, be-

fore it was known whether or not there would be sufficient evidence even to hold them for a hearing. These depositions should have been taken in secret, or the evidence should have been presented to the grand jury in the first instance. There was, in' fact, a grand jury in session at the time. I am unable to see the slightest benefit to be derived from, or any sensible reason for, this statute forbidding the inspection by any person of the depositions, if they are to be taken in public in the presence of newspaper reporters, perhaps for the very purpose of giving currency to them. If I am not correct about this, what are the words "must not permit them to be inspected by any person" in the statute for?

That there was no evidence on which to hold Cassidy is manifest. I think, however, that a prima facie case was made against Willett and Walter, and that the evidence against them should be submitted to a grand jury, and, as said in Commonwealth v. Ridgway, 2 Ashm. (Pa.) 259, "that respectable body are entirely independent of us; they can form their own views of the prosecutor's case, and may, if their judgment so indicates, place the defendant on his trial," or they may refuse to indict. That is all for the grand jury.

HIRSCHBERG, J., concurs.