(174 App. Div. 144)

### PEOPLE v. SOLOMON et al.

(Supreme Court, Appellate Division, Second Department. October 6, 1916.)

1. GAMING ☜73—"BOOKMAKING"—WHAT CONSTITUTES.

It is "bookmaking" within Penal Law (Consol. Laws, c. 40) § 986, defining the offense, to accept wagers on races after quoting odds to betters and having them write out slips, although no list of odds is posted, and the transactions are unadvertised, if the acceptance of wagers is promiscuous.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. §§ 187, 188; Dec. Dig. ☜73.

For other definitions, see Words and Phrases, First and Second Series, Bookmaking.]

2. GAMING ☜73—BOOKMAKING—WHAT CONSTITUTES.

It is no defense to a charge of bookmaking that Penal Law, § 986, applies to professional gamblers, while accused has gambled only four days; the law making no distinction between professionals and amateurs.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. §§ 187, 188; Dec. Dig. ☜73.]

Appeal from Court of Special Sessions of City of New York.

Morris Solomon and Jules Cahn were convicted of an offense, and they appeal. Affirmed.

Argued before JENKS, P. J., and THOMAS, CARR, STAPLE-TON, and RICH, JJ.

Valentine Taylor, of New York City (Morris I. Price, of New York City, on the brief), for appellants.

William J. Morris, Jr., of New York City (Denis O'Leary, Dist. Atty., of Long Island City, and Theodore J. Groh, of New York City, on the brief), for the People.

THOMAS, J.  Two men, Solomon and Cahn (Cahn at times in the record is called Craphers), were in front of the grand stand, Aqueduct Race Track, in the county of Queens, on July 3d, 5th, 6th, and 7th, and in association did what is the subject of the four counts of the information upon which they were tried and convicted by the Court of Special Sessions and sentenced to be imprisoned in the workhouse; Solomon for 15 days and Cahn for 30 days.  The oral evidence against them is furnished by two police officers, whose testimony is easily preferred to the manifestly contrived stories of the defendants.  Officer Horn saw the men located as stated, and was asked by Cahn if he wanted "to lay a bet on any of the horses in this race," and, in answer to Horn's inquiry, said that he and Solomon were "making book on the races," and that the latter was placing the odds.  He instructed Horn "to mark the name of the horse, the odds, and amount you want to bet on a slip of paper, and give it to me with the money."  Horn then asked Solomon for the odds on a horse named Garbage, and received the reply "Three to five."  Horn "marked on a slip of paper, 'Garbage, three to five to win,' and signed it 'Jos. H.,' and * * * handed the slip * * * and a $5 bill to * * * Craphers, and he looked at it and placed" the money in his pocket and gave the slip to Solomon.  Solomon "looked at his racing program, and * * * at the slip * * * and said, 'Whose is this?'"  Craphers pointed to Horn and said, "His."  Then Solomon inquired, "What initial is this?" and, after receiving the reply, "Joseph H.," asked Craphers, "Did you get the $5?" and in reply to an assent said, "All right," and placed the slip in his pocket.  A number of other men asked the odds from Solomon, and he quoted them, and they handed slips of paper and money to Craphers.  Patrolman Hellrigle was there, and inquired of Solomon, "What price are you laying on Sharpshooter?" and received the reply, "Six to five," with advice to make the bet in the way described by Horn.  The horses designated by the officers did not win, but the officers saw men, to whom slips had been given, approach the defendants, one of whom had money in his hand, from which he disbursed in the manner described by Horn.  Solomon "would ask how much was coming to them, and they would name an amount of money, and he would look on his racing program and answer, 'Right.'"  On July 5th the officers dealt with the defendants in the same way, but money was paid to each of them, as well as to others, by reason of the designated horses winning.  On July 6th and 7th the

officers and others operated similarly with the defendants. After the sixth race, the defendants were arrested, and slips were taken from Solomon. Officer Hellrigle gave similar testimony.

[1] The learned counsel for the appellants in his brief states that the information "merely charges these defendants with violation of section 986 of the Penal Law, which is a practice known as 'bookmaking.'" I will discuss the question whether they were doing that. The defendants were co-operating. A schedule of odds was not posted or distributed, but Solomon, looking at a program, announced to an inquirer the odds on a horse selected by the latter. So appears a prepared valuation of the relative speed and endurance of the several horses designated to race, and odds fixed accordingly. It was not necessary that the bookmaking should be in writing, although here Solomon seemed to carry the odds on paper. But it was enough that he announced it. He did not cry it to the throng, but disclosed it to persons attracted to him. Horn asked for it because Cahn invited a bet from him and instructed him how to make it. The crowd was not solicited in ensemble, but persons were drawn individually by the two men working their scheme, or by special suggestion, as was Horn, or in both ways. He would be a very immature person who failed to understand, if he observed at all, that the defendants were engaged in some undertaking, and the nature of it, even if he did not receive the invitation extended to Horn. The affair was conducted as publicly as the operators deemed safe, nor is there indication that any one was rejected, not even detectives, whom Solomon would include in the circle of acquaintanceship. The customer wrote the slip, on which was his name, the horse, the odds, the amount bid, all necessary to make a complete record of the transaction, and he alone paid in money. The gamblers did not write it; but they told the others to do it, and then they took the record and kept it, and Solomon looked on his program for the odds and, later, for the amount due a person winning. Cahn received the money, and, after glancing at the slip, evidently to note the terms, handed it to Solomon, who identified the man with the name on it and then put the slip in his pocket. So the customer wrote up the transaction for the operators, who took the memorandum and appropriated it to their use. The gambler made his victim register and record, took and kept and used the record and made it his own. That is bookmaking within the amended statute. In People v. Lambrix, 204 N. Y. 261, 97 N. E. 524, where bookmaking was not involved, one party made a memorandum and handed it to the defendant, and it was decided that it was not registering or recording a bet or money bet. But here the manifest scheme was that the customer should write the memorandum for the benefit and use and possession of the gamblers. What, then, is presented?—two men for four days announcing from perusal of a program to several persons odds on horses to race; direction by them of a paper containing the terms of the bet; the receipt of the paper, and the money paid in only by the customer; payments to those persons winning, identified by a reference to the program. There is the public engagement in bookmaking; the attraction of customers, the public declaration of

the odds to one person, but within hearing of others; the payment to those winning in the race. What more is needed to bring the case within the statute?

[2] It is urged that the statute is directed against professional gamblers, and that the defendants operated for a time too limited to be such. That would mean that one person could, with impunity, have his day of doing what would be a crime if done for some time longer. Penal statutes do not regard such actors as mere private amateur gamblers because they operate only on occasions. It is not the duration of the occupation that gives it criminal quality under the statute, but what the contrivance is and its relation to the public. The defendants had prestudied the subject and fashioned devices that bore no similitude to the unpunishable wagers of comrades or mere private betters, and should not escape because in cunning they dispensed with posters or circulars. It seems to be a misapprehension that a list of odds must be seen to be effective. That might have a wider influence, and hence be more pernicious, but the present scheme had its own drawing influence. It seems quite unnecessary to circulate the terms of a bet, if the public is taught where the information is orally imparted. The principal cases cited by the learned counsel for the appellant may instruct in the history of decision, but none of them has similar facts and some were before the statute was amended. The evidence clearly shows that the defendants were professional gamblers, openly inducing betters from the throng on the race course; that they did everything that a bookmaker usually does, as I am advised by the decisions, except posting or scattering written or printed leaves; but apparently they had the information written on a program, and, in addition, on a slip prepared and delivered to them for their use by the person proposing a horse. After a careful study of the matter, it seems but trifling to assert that they were not bookmaking, and recording and registering bets upon the result of horse races, and doing it all publicly, with solicitation and inducement of those about them, and that they were professional gamblers. I think, however, that the facts do not sustain the fourth count. In People v. Lambrix, supra, page 264 of 204 N. Y., page 525 of 97 N. E., it was said that the amendment of the statute by inserting the words "with or without writing" did not relate to one who records or registers a conclusion to which ready assent is yielded.

There is no error that requires that the judgment be disturbed, and it should be affirmed. All concur.