THE PEOPLE OF THE STATE OF NEW YORK, on Complaint of MARTIN A. LENNON, *v.* FRANK CAMIO, Defendant.

City Magistrates' Court of New York, Borough of Manhattan, Fifth District, November 15, 1937.

*Frank J. Ricca*, for the defendant.

BROMBERGER, C. M. The defendant is charged with violation of section 986 of the Penal Law. The facts, briefly, are as follows:

On October 27, 1937, on West One Hundred and Eleventh street and Eighth avenue, borough of Manhattan, New York city, the arresting officer had this defendant under observation for about ten minutes in the course of the early afternoon, during which time he saw three men variously approach and consult a scratch sheet respectively with the defendant, and thereafter, in each instance, hand the defendant money in bill form. After each of these transactions the defendant made notations on the scratch sheet and in a note book, both of which he held in his hand. Thereupon the defendant was placed under arrest.

The scratch sheet, with the notations thereon, was in the defendant's left hand, and in the pocket of his coat was found the note book, in which were entered the names of various horses, and, opposite them, amounts which the officer stated in his opinion as an expert represented wagers thereon. A sum of money, in bill form, of various denominations, was also found in the defendant's possession.

The arresting officer further testified that the horses whose names were printed on the scratch sheet and entered in the note book, respectively, were scheduled to run that day on various tracks in this and other States of the United States, and that the scratch sheet and note book were part of the paraphernalia typically used by bookmakers in the conduct of their operations; that the place where the defendant was conducting his operations was not a race track or other place where betting on horse racing was legally authorized.

The officer further testified that he could overhear no conversation between the defendant and the various men who had approached and contacted him as above indicated.

At the conclusion of the People's case, the defendant moved to dismiss the complaint upon the ground that the prosecution had failed to establish a *prima facie* case, and, upon decision being reserved, the defendant, without taking the stand or introducing any evidence in his own behalf, then rested and renewed his motion to dismiss. Both these motions are respectively denied.

The court is here confronted with an apparently wide diversity of opinion and much confusion, intermingled with misunderstanding, as to the scope of the statute and the quantum of proof necessary, in the first instance, to support a *prima facie* case.

In the substantial number of similar prosecutions which have been heard before me it has been urged by various defense counsel that direct evidence of a bet is necessary in order to establish a

*prima facie* case of bookmaking. Careful search through all the cases in this State fails to disclose any reported authority to that effect.

In order fully to comprehend the scope of these statutes and the conduct sought to be reached by their provisions, it is necessary briefly to trace their historical development.

The initial legislation relating to poolselling and bookmaking, specifically, is found in chapter 178 of the Laws of 1877, predecessor of section 351 of the Penal Code (1881).

This latter enactment, taken in conjunction with section 343 of the Penal Code, made bookmaking and poolselling crimes wherever conducted within this State.

Some years later the Legislature passed the so-called Ives Pool Law (Laws of 1887, chap. 479) which "authorized and allowed" poolselling and bookmaking on certain race tracks and at certain times.

A struggle thereupon ensued between the race track and the pool room interests which eventually found reflection in subsequent legislation (Laws of 1889, chap. 428) whereby poolselling or bookmaking, except at an authorized race track, were declared to be felonies.

Faced with this drastic legislation, the bookmaking and pool room interests thereupon devised a scheme under which they claimed to be merely forwarders of the money and, consequently, common carriers in transmitting it to the race tracks for betting there.

Parenthetically it may be noted that even at this early stage of legislative development bookmakers and pool rooms ingeniously conceived evasive and avoidatory schemes.

Confronted with this obvious attempt to render the statute nugatory, the Legislature then countered with a further enactment (Laws of 1893, chap. 469) with clear intent and purpose to reach those evasive pretenses. Under this statute it became a felony to record or register bets or wagers, or to sell pools, other than at a race track, or to become the custodian or depositary for gain, hire or reward of any money staked, wagered or pledged, or to be wagered or pledged, or to receive, forward or purport to forward, to or for any race track, any money bet or wagered or money offered for the purpose of being bet or wagered.

Such was the state of the law at the time the Constitution was adopted in 1894, which provided, among other things, that poolselling or bookmaking should not be authorized or allowed within the State. These, however, were not self-executing provisions, and again additional legislation was required to effectuate them. (Laws of 1895, chaps. 570, 571, 572.) The remedy, however, for

a violation of this statute occurring at an authorized race track was limited to a recovery, in a civil action, of the amount wagered. The constitutionality of this legislation was attacked and sustained. (*People ex rel. Sturgis* v. *Fallon*, 152 N. Y. 1.)

Then followed an amendment to section 351 of the Penal Code (Laws of 1901, chap. 636), wherein the violator was guilty of a felony, except when another penalty is provided by law.

The Hart-Agnew Act (Laws of 1908, chaps. 506, 507) again amended the section and constitutes the statute (Penal Law, § 986) presently effective, except for three modifications: (a) " with or without writing," added to include oral bookmaking (Laws of 1910, chap. 488); (b) " except when another penalty is provided by law," inserted (Laws of 1934, chap. 233, § 4, effective April 19, 1934); (c) " and upon conviction is punishable by imprisonment in a penitentiary or county jail for a period of not more than one year," deleted (Laws of 1937, chap. 696, effective September 1, 1937).

A number of adjudications followed the respective statutory enactments. (*Murphy* v. *Board of Police*, 11 Abb. N. C. 337 [1882]; *People ex rel. Sturgis* v. *Fallon*, 152 N. Y. 1 [1897]; *People* v. *Shannon*, 87 App. Div. 32 [1903]; *People* v. *McCue*, Id. 72 [1903]; affd., 178 N. Y. 579 [1904]; *Stevens* v. *McAdoo*, 112 App. Div. 458 [1906]; *Cleary* v. *McAdoo*, 113 id. 178 [1906]; *People ex rel. Sterling* v. *Sheriff of Nassau County*, 60 Misc. 326 [1908]; *People ex rel. Lichtenstein* v. *Langan*, 196 N. Y. 260 [1909]; *People* v. *Bright*, 203 id. 73 [1911]; *People* v. *Lambrix*, 204 id. 261 [1912]; *People ex rel. Shane* v. *Gittens*, 78 Misc. 7 [1912]; *People* v. *Laude*, 81 id. 256 [1913]; *People* v. *McDonald*, 177 App. Div. 806 [1917]; *People* v. *Wright*, 100 Misc. 205 [1917].)

None of these cases requires direct evidence of a bet to sustain a conviction.

Judge HAIGHT, in *People ex rel. Lichtenstein* v. *Langan* (*supra*, at p. 264), defined bookmaking as follows: " The term ' bookmaking ' originally indicated a collection of sheets of papers or other substances upon which entries could be made, either written or printed."

In *People* v. *Solomon* (174 App. Div. 144; affd., 221 N. Y. 502) the court observed (at p. 146): " A schedule of odds was not posted or distributed, but Solomon, looking at a program, announced to an inquirer the odds on a horse selected by the latter. So appears a prepared valuation of the relative speed and endurance of the several horses designated to race, and odds fixed accordingly. It was not necessary that the bookmaking should be in writing, although here Solomon seemed to carry the odds on paper. * * *

He would be a very immature person who failed to understand, if he observed at all, that the defendants were engaged in some undertaking and the nature of it, even if he did not receive the invitation extended to Horn [officer]. The affair was conducted as publicly as the operators deemed safe. * * * Penal statutes do not regard such actors as mere private amateur gamblers because they operate only on occasions. It is not the duration of the occupation that gives it criminal quality under the statute, but what the contrivance is and its relation to the public. The defendants had prestudied the subject and fashioned devices that bore no similtude to the unpunishable wagers of comrades or mere private bettors, and should not escape because in cunning they dispensed with posters or circulars. It seems to be a misapprehension that a list of odds must be seen to be effective. That might have a wider influence, and hence be more pernicious, but the present scheme had its own drawing influence. It seems quite unnecessary to circulate the terms of a bet, if the public is taught where the information is orally imparted. * * * After a careful study of the matter, it seems but trifling to assert that they were not bookmaking, and recording and registering bets upon the result of horse races, and doing it all publicly, with solicitation and inducement of those about them, and that they were professional gamblers."

The last-cited case, now twenty years old, is the latest discussion of what constitutes bookmaking under the statute.

The tenor of the case is clearly indicative of the viewpoint of the appellate courts in applying liberally the provisions of the law involved and in definitely establishing such trend on their part.

In *People ex rel. Rosen* v. *Warden of City Prison* (234 App. Div. 349 [1932]) the police, upon entering the room in which the arrest was made, found the relator seated at a table, and in front of him two racing sheets, two scratch sheets and two other sheets of paper upon which were written the names of horses entered in races to be run that day, and also names of bettors with their respective bets. The officer testified that the relator stated that it was the first day that he had been making book. Two of the other men in the room, upon being interrogated by the officer, admitted that they had placed bets with Rosen. Rosen failed to take the stand at the hearing or to offer any evidence to contradict that introduced by the People, and waived examination. The defendant was held to be guilty of bookmaking as defined by the statute.

It is a recognized fact, and one which accords with human instinct, that bookmakers and poolroom operators necessarily attempt to contravene the statutory provisions by devising schemes

and methods which they believe strip their operations of the evidentiary elements requisite to convict. This conduct on their part is, as I have pointed out, quite historic and completely parallel to earlier attempts then compelling corrective legislation.

With the dearth of reported authority in this State on the quantum of proof, circumstantial or otherwise, necessary to establish the fact of betting, recourse has been had to another jurisdiction where the type of population is comparable to that of our own State.

Here we find sufficient authority for holding the defendant under proof substantially similar in character to that presented in this prosecution.

The provisions of the California statute covering bookmaking (Penal Code, § 337a) are quite similar to those of New York now under consideration.

In *People* v. *Sutherland* (59 Cal. App. 462; 210 P. 965 [1922]; appeal denied, Cal. Sup. Ct. Dec. 27, 1922) it appeared that at the time of his arrest the defendant was occupying three rooms, with a single entrance marked " Brokerage." Two police officers, entering the first of the three rooms, found the defendant seated at a desk engaged in the act of writing upon a card. Another person was leaning over the desk holding some paper money in his hand, indicating that he was about to pass it over to the defendant. When the officers entered, the· defendant dropped the card into a drawer of the desk containing various other cards of similar character. The officers were unable to identify the particular card upon which the defendant had been writing, but testified that the cards were all such as were commonly used by bookmakers in registering wagers. A racing chart found in the room was of the sort typically used by bookmakers in the conduct of their operations. There was no direct evidence of a bet nor of any attempt on the part of the police officers to place a wager with the defendant. The conviction was sustained.

In *People* v. *Carroll* (54 Cal. App. 684; 202 P. 885 [1921]; appeal denied, Cal. Sup. Ct. Dec. 27, 1921), which preceded the *Sutherland* case, the arresting officer testified that he saw three men making " bets " with the defendant, who was ostensibly employed in the cigar store which the officer entered. The defendant was making some records, took money, wrote out slips which he placed on a shelf. The officer heard the name of a horse mentioned and also saw form sheets on the counter. Under cross-examination, the witness testified that he knew the defendant was conducting a bookmaking operation because of his observation of the transactions and because the defendant had previously been arrested for the same offense. The conviction was affirmed.

In the bookmaking charges now before this court we are concerned fundamentally with circumstantial proof and the quantum of evidence necessary to establish a *prima facie* case. As the court observed in another jurisdiction (*Rush* v. *State*, 22 Okla. Cr. 172; 210 P. 316), this is usually the situation in gambling cases.

It may well be concluded from *People* v. *Albert* (136 App. Div. 224; affd., 200 N. Y. 568) that bookmakers are not too obvious about the making of a bet, and that the more experienced the bookmaker in the conduct of such operations the less likely it is that the officer will have an opportunity to overhear directly conversations relating to a bet or to place a wager himself with the bookmaker.

Accordingly, if the law is to be effectuated to a satisfactory degree, recourse must necessarily be had to circumstantial evidence to establish the fact of a wager.

It is well established that convictions of gambling, bookmaking and similar illegal operations may be based upon such circumstantial evidence. (*Robbins* v. *People*, 95 Ill. 175; *Barnes* v. *State*, 77 Ark. 124; 91 S. W. 10; *Harmon* v. *State*, 120 Ga. 197; 47 S. E. 547; *Crosby* v. *State*, 37 Okla. Cr. 312; 257 P. 1113; *Roberts* v. *State*, 25 Ind. App. 366; 58 N. E. 203; *Minochian* v. *City of Paterson*, 106 N. J. L. 436; 149 A. 61.)

Bookmaking has long been recognized as an evil in this State, for many obvious reasons, and it does not appear sound to me for any court to strain itself in favor of these violators. I realize, of course, the incongruous situation which arises where bets made within a certain inclosure are legal and those made elsewhere render the bookmaker liable to prosecution.

However, we are not here concerned with the consistency but solely with the enforcement of the laws which have been adopted by the legislative branch of our State. (*People ex rel. Shane* v. *Gittens, supra*, at p. 14.)

This court cannot be oblivious to the existing evil nor powerless to reach and to remedy it. The time has not yet arrived, in my opinion, when the ingenuity of gamblers, bookmakers and pool room operators can outstrip the intendment of the Legislature and the adequate enforcement of its enactments. I am not ready to concede that bookmakers can devise patent surreptitious subterfuges which will permit them flagrantly to conduct their operations on our public streets and yet make impossible their conviction by our courts.

The Supreme Court has succinctly epitomized the duty of a court in applying legislative provisions in *Sorrells* v. *United States* (287 U. S. 435, at p. 449): " It is the function of the court to construe

the statute, not to defeat it as construed. * * * To construe statutes so as to avoid absurd or glaringly unjust results, foreign to the legislative purpose, is, as we have seen, a traditional and appropriate function of the courts."

The Court of Appeals observed in *Luetchford* v. *Lord* (132 N. Y. 465, at p. 469): "The statute against betting and gaming was enacted as a protection of the public morals. The intention of the Legislature was to discourage and repress gambling in all its forms, and the law under consideration, having been enacted for the public good, is to be construed so as to accomplish, so far as possible, the suppression of the mischief against which it was directed. (*Ruckman* v. *Pitcher*, 1 N. Y. 396; *Storey* v. *Brennan*, 15 id. 527.)"

The court further made what I consider a most timely comment in *People ex rel. Lichtenstein* v. *Langan* (*supra*, at p. 267): "A general failure to enforce such a statute would bring the law into contempt and probably end in suffering all gambling to go unchecked. It might also be hard to differentiate between public and private gambling. For that reason, while the statute makes all bets and wagers illegal and void and money lost thereon recoverable, it has made gambling a crime only where it is accompanied by record, registry or the use of some part of the paraphernalia of professional gamblers, except in the case of poolselling, where probably no writing or record is necessary to constitute the crime."

It seems to me that, where an officer, charged with the enforcement of the law, observes various men successively approaching the defendant, with whom they consult scratch sheets, handing over to him money in bill form, and the defendant, when arrested, is found in possession of a scratch sheet containing markings which the arresting officer, as an expert, testifies indicate bets to him, or of slips containing the names of race horses and amounts which the arresting officer, similarly testifying as an expert, states indicate bets, the court is amply justified, upon that evidence, in reaching the conclusion that the defendant is engaged in bookmaking operations.

Judge CARDOZO in *People* v. *Gerks* (243 N. Y. 166, at p. 170) observes: "Repetition reduces the likelihood of mistake or mere coincidence. We miss the evidence of system when we ignore the succession and concentrate our gaze upon the isolated acts. (1 Wigmore, Evidence, §§ 302, 321, p. 637.)"

The numerous instances constantly presented to us, portraying the same course of conduct, even disregarding for the moment all other pertinent considerations, in my opinion tend to negative a conclusion consistent with innocence rather than with guilt, par-

ticularly where the defendant fails to take the stand or to introduce any evidence in his behalf controverting or explaining the proven transactions.

While no inference of guilt may be drawn from the failure of the defendant to take the stand, nevertheless, the court is then warranted in taking the facts and circumstances which, if innocent, the defendant might have controverted or explained, most strongly against him. (*People* v. *Smith*, 114 App. Div. 513; appeal dismissed, 187 N. Y. 557; *People* v. *Trombino*, 238 App. Div. 61; affd., 262 N. Y. 689.)

It may further be observed, so far as it affects the initial conclusion, that in the instant situation, as well as in all other similar cases before the Magistrates' Court, the committing magistrate is not required to exact the full measure of proof necessary to secure a conviction, but is obliged to hold one accused of crime for trial if there is reasonable ground to believe him guilty thereof. (*People ex rel. Willett* v. *Quinn*, 150 App. Div. 813.)

Section 208 of the Code of Criminal Procedure requires the magistrate to hold the defendant when it appears from the examination that a crime has been committed and that there is sufficient cause to believe the defendant guilty thereof. (*People ex rel. Giallarenzi* v. *Munro*, 150 Misc. 41; *People* v. *Gussfeld*, 87 id. 274.)

In *Matter of Paul* (94 N. Y. 497, at p. 502) the court held: "The examination was signed by the witness and certified by the magistrate, and is before us, returned as part of the record. * * * Other statements tended in the same direction, and, while the evidence was weak and lacked precision, there was enough to call into play the discretion and judgment of the magistrate. He held the prisoner for trial."

Upon the proof here presented, I am satisfied that the prosecution has established a *prima facie* case and that there is reasonable evidence to believe the defendant to be guilty of the offense charged. Accordingly, I hold him to answer the same at the Court of Special Sessions and fix bail in the sum of $500.