(164 App. Div. 1)

### PEOPLE v. WILLETT.

(Supreme Court, Appellate Division, Second Department.   October 2, 1914.)

1. Criminal Law (§ 1130*)—Appeal—Briefs—Improper Language.
    Where the district attorney's brief on appeal, in a criminal case, characterized the conduct of the justice of the Supreme Court, who·granted a certificate of reasonable doubt as "intellectual inertia," "unmitigated unthinking," and "plain blundering," followed by expressions which could only be interpreted as charging judicial insincerity and duplicity, the language was contemptuous, and the brief would be stricken from the files.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2956, 2965–2970, 3205; Dec. Dig. § 1130.*]

2. Criminal Law (§ 823*)—Instructions—Cure by Withdrawal.
    Error could not be predicated upon instructions which, upon the request of the complaining party, were wholly withdrawn.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1992–1995, 3158; Dec. Dig. § 823.*]

3. Criminal Law (§ 1038*)—Reservation of Grounds of Review—Objection.
    Error could not be predicated upon the giving of instructions, where, upon the request of the complaining party, they were withdrawn and given in a modified form, to which no objection was made.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2646; Dec. Dig. § 1038.*]

4. Criminal Law (§ 912½*)—Appeal—Reservation of Grounds of Review—Exceptions.
    While, under the express provisions of Code Cr. Proc. § 527, the court on appeal may order a new trial, though no exception has been taken, if satisfied that the verdict against a prisoner is against the weight of the evidence or against law, or that justice requires a new trial, where no exception was taken to instructions, and the charge in its entirety was perfectly fair and not against the law, the verdict was not against the weight of the evidence, and the cause of justice would not be promoted by a new trial, a new trial will not be granted.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2136; Dec. Dig. § 912½.*]

5. Elections (§ 316*)—Criminal Offenses—Payment of Money to Obtain Nomination.
    Penal Law (Consol. Laws, c. 40) § 775, the caption of which reads "corrupt use of position or authority," provides that any person who, while holding a public office or being nominated or seeking a nomination, accepts or requests any nomination or appointment upon the payment or contribution of any valuable consideration, or upon an understanding or promise thereof, etc., is punishable as there provided. *Held* that, to a conviction for accepting or requesting any nomination upon the payment or contribution of any valuable consideration, it is not essential that the person to whom the payment is made shall hold a public position, and a payment of money to the chairman of a party committee and to a delegate to a convention, who nominated accused in such convention, for an office, constituted the offense; it appearing from the evidence that the chairman exercised authority over the delegates to the convention.
    [Ed. Note.—For other cases, see Elections, Cent. Dig. § 343; Dec. Dig. § 316.*]

6. Statutes (§ 211*)—Construction—Title as Aid to Construction.
    When the language of a statute is ambiguous, reference may be had to the title as an aid to construction and to interpret its meaning, but, when

the language is clear and specific, there is neither room nor occasion for construction, and the title cannot control or limit the unambiguous language employed.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 288; Dec. Dig. § 211.*]

7. ELECTIONS (§ 329*)—VIOLATION OF ELECTION LAW—EVIDENCE—CONDUCT OF DEFENDANT WHEN ACCUSED OF OFFENSE.

On a trial for requesting and accepting a nomination for a public office upon the promise of a valuable consideration, evidence as to a newspaper article charging accused with the offense and his subsequent untrue statement was properly admitted, where it was admitted solely with relation to accused's conduct in the face of the accusation, and the court charged that it could be considered only for that purpose, and as bearing upon the interest and credibility of the witness connected with the financial transactions involved, since the conduct of a party is admissible as an admission or a self-contradiction, and, to make defendant's false statement intelligible, it was necessary to show that to which the statement was a reply.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 364–366; Dec. Dig. § 329.*]

Jenks, P. J., dissenting in part.

Appeal from Trial Term, Queens County.

William Willett was convicted of requesting and accepting a nomination for a public office upon the understanding and promise of a valuable consideration, and he appeals. Affirmed.

Certificate of reasonable doubt granted, 149 N. Y. Supp. 390.

Argued before JENKS, P. J., and BURR, CARR, RICH, and PUTNAM, JJ.

Robert H. Elder, of New York City, for appellant.
James C. Cropsey, Dist. Atty., of Brooklyn, for the People.

BURR, J. It is with sincere regret that we observe that the learned district attorney, in the brief submitted by him, has employed language relative to the justice of this court who granted to defendant a certificate of reasonable doubt, which is unworthy of a gentleman, a member of a learned profession, and the incumbent of an important constitutional office.

[1] Just and fair criticism of a judicial opinion, couched in respectful language, is rather to be commended than condemned.

Under its light the search for truth is made more easy, its discovery more certain. In the brief referred to these limitations have been far exceeded. Such alliterations as "intellectual inertia" and "unmitigated unthinking," both inapt and the latter senseless, as also the expression "plain blundering," are discourteous and insulting. When, as in this case, these are followed by expressions which can have no interpretation except to charge judicial insincerity and duplicity, the language becomes contemptuous. We cannot permit a brief of such a character to remain as a part of the records of this court. We direct that it be stricken from the files, and the clerk of this court is directed to return to the district attorney the copies thereof.

Defendant was convicted of the crime of requesting and accepting

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a nomination for a public office, upon the understanding and promise of a valuable consideration, and upon the payment of such consideration therefor. Upon a previous appeal we considered the sufficiency of the evidence introduced before the committing magistrate to establish prima facie "the commission of this crime." People ex rel. Willett v. Quinn, 150 App. Div. 813, 135 N. Y. Supp. 477. We deemed it sufficient. Upon the trial of the indictment subsequently found, the proof of guilt was so conclusive that without hesitation the jury rendered its verdict. The learned counsel for appellant, neither upon the oral argument nor in the brief submitted by him, contends that such verdict was contrary to the evidence or to the weight thereof.

We may pass at once to consideration of the exceptions. Some of these may have been involved in the previous appeal, but, in view of the earnest argument of counsel for appellant, we have reconsidered them. They may be classified under three heads: (1) That the facts proved do not constitute a crime within the meaning of subdivision 3 of section 775 of the Penal Law; (2) that damaging testimony was erroneously admitted, to defendant's prejudice; and (3) that the learned trial court committed error in its instructions to the jury.

[2-4] With regard to the last point, it is sufficient to say that the language of the charge, commented upon by appellant, was in two instances wholly withdrawn, or was modified at the request of defendant's counsel. No objection was made to the charge in its modified form. With regard to the remaining criticisms upon the instructions of the trial court, it appears that at the time no exception was taken to the language employed. While it is true that this court may "order a new trial if it be satisfied that the verdict against the prisoner was against the weight of evidence or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below" (Code of Criminal Procedure, § 527), none of the conditions referred to are here found to exist. Taken in its entirety, the charge was perfectly fair and impartial, and was not against the law. We have expressed our convictions as to the weight of the evidence. The cause of justice would be hindered, and not promoted, by ordering a new trial in this case.

[5] Appellant's position respecting his first point is thus stated by him:

"There can be no violation of section 775 (of the Penal Law), or of any subdivision thereof, except by some occupant of a public position and wielder of official authority, or by some person in conspiracy with such official. Its violation always, of necessity, requires the co-operation of such a person."

Proceeding with the argument, he contends that as neither Cassidy nor Walter, with whom the indictment charges and the proof establishes that defendant made an agreement to nominate him for the office of justice of the Supreme Court at a judicial convention, held in the borough of Brooklyn on October 6, 1911, in return for the payment to them of a valuable consideration, to wit, a sum of money, held "public positions," or were the "wielders of official authority," conceding that the evidence established such agreement, no crime has been committed. "Lex non ita scripta est."

The full text of the section under consideration is as follows:

"Sec. 775. Corrupt Use of Position or Authority.—Any person who:

"1. While holding a public office, or being nominated or seeking a nomination or appointment therefor, corruptly uses or promises to use, directly or indirectly, any official authority or influence possessed or anticipated, in the way of conferring upon any person, or in order to secure, or aid any person in securing, any office or public employment, or any nomination, confirmation, promotion or increase of salary, upon consideration that the vote or political influence or action of the person so to be benefited or of any other person, shall be given or used in behalf of any candidate, officer or party or upon any other corrupt condition or consideration: or,

"2. Being a public officer or employé of the state or a political subdivision having, or claiming to have, any authority or influence affecting the nomination, public employment, confirmation, promotion, removal, or increase or decrease of salary of any public officer or employé, or (sic) promises or threatens to use, any such authority or influence, directly or indirectly to affect the vote or political action of any such public officer or employé, or on account of the vote or political action of such officer or employé; or,

"3. Makes, tenders or offers to procure, or cause any nomination or appointment for any public office or place, or accepts or requests any such nomination or appointment, upon the payment or contribution of any valuable consideration, or upon an understanding or promise thereof; or,

"4. Makes any gift, promise or contribution to any person, upon the condition or consideration of receiving an appointment or election to a public office or a position of public employment, or for receiving or retaining any such office or position, or promotion, privilege, increase of salary or compensation therein, or exemption from removal or discharge therefrom,

"Is punishable by imprisonment for not more than two years or by a fine of not more than three thousand dollars or both."

Appellant contends, because the caption of this section is in the words "corrupt use of position or authority," that it should be read as if it were corrupt use of "public" position or "official" authority. This would be reading into such caption words not found therein. If the caption of the subdivision is to be resorted to at all in order to construe the meaning of the subsequent text, it would seem to us that it is sufficient if the person performing the act held any position or exercised any authority which made it possible for him effectively to bargain with respect to such nomination, whether or no such position was that of a "public officer" or a "public employé." Walter was a delegate to the judicial convention. He placed defendant in nomination. He held a position in such convention and exercised an authority with respect to its action of greater or less efficiency, but it was "position," and it was "authority." The evidence would justify the conclusion that Cassidy held such "position" as chairman of the Democratic county committee in Queens county, and exercised such "authority" over the delegates to that convention from said county, as was little less than absolute.

Again analyzing the language of the entire section, it consists of a subject relating to the whole thereof, expressed in the words "any person who," four subdivisions, separately numbered 1, 2, 3, and 4, qualifying such subject, and an object relating in like manner to all persons affected thereby in the words "is punishable by imprisonment for not more than two years or by a fine of not more than three thousand dollars or both." Subdivisions 1 and 2 primarily (although, as we shall show, not exclusively) do relate to one who does hold a "public office,"

·or to one who is a "public officer or employé of the state or a political subdivision" thereof. These words are expressly employed therein. But when we come to subdivision 3, under which this indictment was found, all reference to "public position" or to a "public officer or em-ploye" is omitted. Treating these various subdivisions, divided in each case by a semicolon, followed by the disjunctive "or," as their arrangement and punctuation would require as separate, distinct, and not interdependent, subdivisions, and the law is:

"Any person who: * * * Makes, tenders or offers to procure, or cause any nomination or appointment for any public office or place, or accepts or requests any such nomination or appointment, upon the payment or contribution of any valuable consideration, or upon an understanding or promise thereof—* * * is punishable by imprisonment for not more than two years ·or by a fine of not more than three thousand dollars or both."

Again, subdivision 1 of the section relates to two classes of persons, those "holding a public office" and those "seeking a nomination or appointment therefor" and the thing condemned is corrupt use of "official authority or influence possessed or anticipated." By its express language, while primarily it relates to the use of official power or authority, it is not necessarily limited to one at the time of the com-mission of the forbidden act actually holding such position or possessing such authority.

[6] When the language of a statute is ambiguous, reference may be had to the title thereof as an aid to construction and to interpret its ·meaning. Endlich on Interpretation of Statutes, § 58; James v. Du Bois, 16 N. J. Law, 285. But, when the language is clear and specific, there is neither room nor occasion for construction, and the title of an act is in such a case never allowed to control or limit the unam-biguous language employed. 2 Sutherland on Statutory Construction, § 210; Commonwealth ex rel. A. P. & C. Co. v. Slifer, 53 Pa. 71; Neumann v. City of New York, 137 App. Div. 55, 122 N. Y. Supp. ·62.

But, if we wander somewhat afield, the title of the act of which section 775 is a part is "An act providing for the punishment of crime, ·constituting chapter 40 of the Consolidated Laws." Laws of 1909, c. 88. The section under consideration is part of article 74, entitled "Elective franchise," which article is wholly devoted to defining offenses against the pure and uncorrupted exercise of the voting privilege and of matters and things connected therewith, by any person whomsoever. Finally, as we have pointed out, the caption of this particular section is not corrupt use of "public position" or "official authority," but of any position, whether that of a public official or otherwise, carrying power or authority with it. We think appellant's contention in this regard is not sustained.

[7] We are still to consider whether any evidence was improperly admitted during the course of the trial, to defendant's prejudice. After defendant was nominated at the Democratic judicial convention on October 6, 1911, and during the succeeding campaign, and on October 18th of the same year, the Standard Union, a newspaper circulat-ing in the borough of Brooklyn, published an article entitled "Tam·-

many's Tainted Touch on a Judiciary Ticket," which, among other things, contained the following language:

"The first nominations to the Supreme Court bench in this district were made under the Tammany method this year. The tainted hand of Tammany rests on them. The Democratic people had nothing to do with these nominations. The candidates are Boss nominees pure and simple, and as to one of them there is already a rumor of a shocking scandal involving the payment of a large sum of money. If the taxpayers and rentpayers want to encourage the deliberate raid made by Tammany on their pockets when these judgeships were created, they will vote for the Tammany judiciary ticket. The defeat of that ticket would be the sort of warning future Tammany raiders would heed."

Immediately thereafter, defendant, in connection with Mr. Herbert T. Ketcham and Mr. Patrick E. Callahan, his associates upon the judiciary ticket nominated at said convention, filed separate informations, one being verified by this defendant, and to which the article in question in its entirety was attached, in which informations they charged Mr. William Berri, the publisher of said paper, with criminal libel in connection therewith. A warrant was thereupon issued for his arrest. When arraigned before the magistrate on October 20th, the proceeding was adjourned to October 23d, and on that date it was again adjourned to October 27th. On October 26th defendant united with Mr. Ketcham and Mr. Callahan in a letter addressed to Mr. Berri, which is in the following language:

"Referring to the matter of the proceedings now pending in the magistrate's court, wherein we are the complainants against you, certain facts have been brought to our attention which make it apparent that the prosecution was instituted mistakenly. We now join in saying that we sincerely regret having instituted these proceedings or having thereby caused you any annoyance. We shall instruct our counsel to terminate the matter by withdrawal of the proceedings in court."

The criminal proceeding against Mr. Berri was thereupon withdrawn. On October 28th Mr. Ketcham and Mr. Callahan each issued a statement to the newspapers published in the borough of Brooklyn, which was on that day published by them. Each of them asserted his complete innocence of any criminal or improper conduct. In Mr. Ketcham's statement, among other things, were these words, referring to the institution of the proceeding for criminal libel:

"The only mistake on my part which required the withdrawal was my original confidence that, with respect to all Democratic nominees, the article contained an unjust accusation."

Mr. Callahan's statement contained these words, among others:

"Since the proceedings were taken, certain facts concerning the nomination of Mr. Willett, before unknown to me, were brought to my attention. Those facts convinced me, so far as Mr. Willett was concerned, there were strong grounds for the position taken by Mr. Berri and the Standard Union."

After seeing these statements, defendant also issued and caused to be published in the same papers a statement in which, referring to those issued by his associates, which he characterized as "extraordinary," he purported to give what he termed "a plain statement of my financial

affairs during the past month, which is now assumed to be the foundation of the Standard Union attack." In that statement he asserted that:

"I have had occasion to borrow, from certain banks, the sum of $20,000 and no more, within about 30 days."

He then stated that $5,000 of this amount was used to take up a note of $5,000, due October 22, 1911, $5,000 to purchase some stock from Louis T. Walter (who, as we have seen, was one of the delegates to the convention, and the man who nominated him thereat), and that the remaining $10,000 was borrowed for the purpose of spending it, should that much be needed during the campaign, and that the most of the latter amount was still in his possession. That this was not the whole truth in regard to his financial affairs in connection with his nomination was conclusively established by the evidence in this case. Although the evidence may not establish that he directly borrowed more than $20,000 from banks, it did establish that he had also borrowed upon his note to the order of Mr. Frank R. Merrill, a personal friend, and discounted at the bank of the latter, for his accommodation, within 36 days of the date of said statement, an additional sum of $5,000. When defendant obtained this loan, he asserted that it was to be used in connection with the primary elections in Queens county, at which delegates to the assembly conventions were chosen, which in turn elected delegates to the judicial convention. It appeared from the evidence that in no true sense had $5,000 of the $20,000 subsequently borrowed been used to pay this note. If it was the fact that $5,000 of the cash obtained by defendant in "big bills," mostly of the denomination of $1,000 each, from the National Bank of Far Rockaway, upon the first loan of $10,000 on the 30th of September, was used to pay this note, it was only after defendant had obtained an equal sum in cash by the sale of stock belonging to said Merrill, which he had given to defendant's brother, with defendant's knowledge, to enable him to take up said note. Though there was a cash payment to Walter of $5,000, also in "big bills," and some evidence of a transfer of certain certificates of stock in two corporations, if the payment was in consideration of such transfer, the jury were justified in finding that the stock was of little or no value, and the transaction merely colorable. Finally, there was evidence to contradict defendant's statement that at the date thereof he still had in his possession the greater portion of the remaining $10,000.

Appellant contends that the admission in evidence of the article from the Standard Union, of the subsequent statements of Mr. Ketcham and Mr. Callahan respecting the same, and of the institution and withdrawal of the criminal prosecution of Mr. Berri on account thereof, and of the evidence respecting the manner of payment of the Merrill note, was erroneous and prejudicial. If any of this evidence had been admitted as of itself establishing the fact of defendant's guilt or innocence, it might be criticized. It was admitted for no such purpose. In addition to the evidence establishing defendant's guilt, the evidence now under consideration was admitted solely with relation to defendant's conduct in the face of accusation thereof. When the evidence was offered, the learned trial court was careful to state to the jury that it was admitted solely for the latter purpose; and in its instructions to

the jury it was careful to say, referring to the statements of Mr. Ketcham and Mr. Callahan:

"These are allowed in evidence for the purpose of determining whether the defendant's conduct in the light of these statements was indicative of guilt or innocence."

And again:

"The same is true as to the article published in the Standard Union. These are admitted in evidence so that you can see just what the charge was, and whether this man's conduct, when he knew what he was charged with, when he knew how vicious the charge was, indicated his freedom from guilt or his consciousness of guilt."

So with regard to the manner of payment of the Merrill note, the trial court again instructed the jury as follows:

"Now, there is testimony before you as to the payment of the note made by Merrill. You will remember that as a part of the people's case I allowed testimony to be given as to the method by which that note was paid. Mr. Willett had issued a statement in which he said that this loan that he had subsequently procured was for the purpose of paying that note made to Merrill, so the people were entitled to snow that that statement was false; and in order to do that, in order to furnish evidence which they claim showed it to be false, they had the right to show just the method by which it was paid, as one of the links necessary in the chain. * * * Originally that was all that you could consider that testimony for, as bearing upon the question as to whether that payment was made by the defendant or was made by means of money which his brother raised from the stock or bonds of Mr. Merrill. But, as the case progressed, Marinus Willett was called as a witness for the defendant, and then this chain of circumstances became of value in another way. It became of value as bearing upon his interest in the case, his truthfulness and his credibility as a witness; and at last, if you find from the evidence in the case that this was done by the direction of the defendant, and you find that these circumstances indicate guilt, you may consider them upon the question as to whether the defendant is guilty. But, unless you find that this was done at his instigation, then it cannot be considered as direct evidence of his guilt. So, to make that plain, I will say that you cannot make the defendant responsible here, for something that his brother did, and the inference which would result from his brother's doing something in a circuitous manner cannot be attributed to the defendant by inference. You cannot base one inference or presumption upon another inference or presumption; you must find the direct connection."

Thus limited, the evidence was properly received. Conduct, when it emanates from a party to the cause, can be justified equally as an admission or a self-contradiction. 1 Wigmore on Evidence, 267, subd. "b." No conduct is necessarily conclusive. On the other hand, no conduct is without significance of greater or less weight, according to circumstances.

"Prominent among admissions by conduct is the making of false statements by the accused regarding important matters involved in the inquiry. The inference is * * * that one who seeks to deceive others or a court of justice as to the truth of the facts involved knows that he will be shown to be guilty in a criminal proceeding * * * were the facts fully known. The government, therefore, is at liberty to show the most self-serving explanations or other statements of the accused with a view to proving the fact that they are false and that the accused must have known it." 2 Chamberlayne's Modern Law on Evidence, 1417.

See, also, Wigmore on Evidence, 278; Moriarty v. L., C. & D. R. R. Co., Law Reports, 5 Q. B. 319; McAdory v. State, 62 Ala. 154; Walker

v. State, 49 Ala. 398; Hinshaw v. State, 147 Ind. 334, 362, 47 N. E. 157; State v. Benner, 64 Me. 267, 289; Commonwealth v. Devaney, 182 Mass. 33, 64 N. E. 402; Coleman v. People, 58 N. Y. 555, 560; Wilson v. United States, 162 U. S. 613, 621, 16 Sup. Ct. 895, 40 L. Ed. 1090.

Defendant's statement was shown to be false. To make it intelligible, that to which the statement was a reply must also be shown. As the learned trial court aptly put it (in speaking of the article in the Standard Union):

"No matter what it charges against anybody else or against any organization, or the purposes of any change in the district, or anything of that kind, or even a charge direct against Mr. Willett, that is not evidence against him, and the sole purpose of admitting the article is that it may illustrate, if it does tend to do so, any remark, or omission to remark, upon the part of Mr. Willett."

And again, in speaking of the statements of Mr. Ketcham and Mr. Callahan, the court said:

"This is what prompted his statement. It is just like a part of a conversation. The question that is asked that prompts the statement made by the defendant is competent, the same as the defendant's statement."

And again:

"Suppose I accuse you of something, and you say, 'Well, then, I will have to make a denial of it;' but you make a statement which is not a denial. Then the accusation and the statement are both competent."

The evidence was properly received. The jury were abundantly cautioned as to the use to be made of it.

The case is an important one; important to the people, and vitally important to defendant. The affirmance of this conviction may mean the wreck of a promising life. We have carefully examined every page of this voluminous record. Defendant's guilt seems conclusively established. Regardless, therefore, of consequences, we must discharge the duty devolved upon us. The springs from which the fountain of justice flows must be kept clear and unpolluted.

The judgment of conviction in this case must be affirmed. All concur. JENKS, P. J., concurs in separate opinion.

JENKS, P. J. I concur in the opinion of BURR, J., as it affirms the judgment, but not as it disposes of the brief submitted by the district attorney. I vote that the clerk be directed to strike out from all copies of that brief submitted to this court for any purpose the following sentences in pages 65 and 66 thereof:

"This is a perfect manifestation of intellectual inertia. These words are just unmitigated unthinking. They are used apparently to conceal whatever ideas may have been in the judicial mind."

I think that there should be no other notice taken of the brief or of the writer thereof. The district attorney undertook to criticize the opinion of the justice who granted the certificate of reasonable doubt. In the course of that criticism, he had the right to say, if he so thought, that the justice was careless; that is, that the justice did not exercise due care in the consideration of the matter before him. He had the

right to assign the discussion or the determination of the justice to lack of an exercise of his intellectual powers. He had the right to characterize the opinion or any part thereof as manifesting lack of thought for which there was no mitigation. And my vote is not in denial or in disparagement of these rights. But my vote is given because of disapproval of the verbiage of the criticisms made in a brief submitted to an appellate court.. The words are not of utterance but of writing—not spoken in the ardor of advocacy, but set down in the calm of composition. And while the words are addressed to those only who are supposed to be convinced by argument alone, they are published, and they may be read by any one. Language permissible in harangue or admissible in controversy or debate is not, therefore, style for discussion of the errors of the head and not of the heart of a judge, when his decision is under legal review.

The third sentence is subject to further criticism. A man may conceal his ideas without blame, and may use speech to conceal them. But the suggestion is that a judge has apparently used language in the course of a judicial opinion to conceal any ideas which may have been in his judicial mind. Of course the reference is to ideas, if any, which were pertinent to the case in hand, otherwise it would be meaningless. To suggest that a judge concealed such ideas, if any, by judicial utterances made for that purpose permits the inference that for some reason he was guilty of guile or of suppression. If such inference is permissible, it naturally suggests the inquiry: Why should a judge do this thing? Was there any reason peculiar to this case why the judge should not be outspoken as to any judicial ideas in his mind pertinent to the case, rather than attempt to cover them up by language used only for that purpose? I do not impute any intention to the district attorney by these words to allude to any judicial obliquity. I do not believe that he had such an intent. But the criterion is, not his intention, but a reader's possible inference. I am careful to note that the sentence is hypothetical, for the reference is not to any ideas that were, but to whatever ideas may have been, in the judicial mind. If one should say that I thus attribute too much to the words, then, in any event, they are within the criticism made upon the other two sentences in the brief.

I regret the incident. I believe that the learned district attorney thought that he was within the bounds of legitimate criticism when he set down these words. The sentences do not make for a brief which is able, thorough, and convincing, and naturally may give umbrage to a justice distinguished for his labor, his learning, and his character.