(164 App. Div. 15)

## PEOPLE v. CASSIDY.

(Supreme Court, Appellate Division, Second Department.   October 2, 1914.)

1. ELECTIONS (§ 329*)—PROCURING NOMINATION TO PUBLIC OFFICE—PAY-MENT OF CONSIDERATION—EVIDENCE.

In a prosecution of accused, a powerful political leader, for making, tendering, and offering to procure and to cause a nomination of one W. for justice of the Supreme Court on the payment and contribution of a valuable consideration and on the understanding and promise thereof, evidence *held* to sustain a conviction.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 364–366; Dec. Dig. § 329.*]

2. ELECTIONS (§ 329*)—VIOLATION OF ELECTION LAW—EVIDENCE—EVIDENCE ADMISSIBLE BY REASON OF THE ADMISSION OF OTHER EVIDENCE.

Where, in a prosecution of a political leader for selling a nomination for the office of justice of the Supreme Court, a witness, from whom the nominee had obtained $5,000 of the money claimed to have been paid to defendant on a note discounted at the witness' bank, testified that the note must have been paid at maturity, because witness never saw the note or heard anything about it thereafter, in order to raise an infer-ence that the nominee paid the note from money borrowed from other sources, evidence that the note was not thus paid, and that the witness' testimony that he had never heard of the note afterwards was untrue, but that he had given to the nominee's brother certain railroad stock to be sold, and that with the witness' knowledge the proceeds of the stock were used to pay the note, and that a portion of the sum obtained from the sale of the loaned stock was still owing to the witness, was admissible under the rule that where evidence is elicited on cross-examination, from which an inference favorable to defendant may be drawn, subsequent evidence of other facts or circumstances showing that the inference is un-warranted is competent.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 364–366; Dec. Dig. § 329.*]

Appeal from Trial Term, Queens County.

Joseph Cassidy was convicted of making, tendering, and offering to procure and to cause a nomination to a public office on the payment and contribution of a valuable consideration, and on the understand-ing and promise thereof, and he appeals.   Affirmed.

Certificate of reasonable doubt granted, 149 N. Y. Supp. 390.

Argued before JENKS, P. J., and BURR, CARR, RICH, and PUTNAM, JJ.

Robert H. Elder, of New York City, for appellant.

James C. Cropsey, Dist. Atty., of Brooklyn, for the People.

BURR, J.   All but one of the questions of law presented by the exceptions taken upon the trial of this action have been considered in the case of People v. Willett, 149 N. Y. Supp. 348, decided herewith. The question of fact is: Was defendant's guilt established beyond a reasonable doubt?   When the evidence taken before the committing magistrate was reviewed by this court on an appeal from an order dis-missing a writ of habeas corpus and remanding the prisoner, we deemed such evidence insufficient to warrant his detention.   People ex rel. Cassidy v. Quinn, 150 App. Div. 813, 135 N. Y. Supp. 477.

Upon the trial of the indictment subsequently obtained, the evidence was greatly strengthened. His guilt then became clearly a question of fact for the jury. We think that its verdict was properly rendered, and that the judgment of conviction should be affirmed.

[1] It would be unwise, within the limits of an ordinary opinion, to review in its minutest detail all of the evidence presented in the trial court. We shall attempt to point out its salient features. In this tragedy there are three actors: Willett, the aspirant for a judicial nomination; Cassidy, the powerful political leader who controlled such nomination, and Walter, the go-between. There are three important dates: The date of the primaries at which delegates to the assembly convention were elected; the date of the meeting of the assembly convention at which delegates to the judiciary convention were chosen; and the date of the judiciary convention. The first was September 26, 1911; the second was October 2d; and the third was October 6th of the same year. The previous relation of the parties is not without significance. Two years before, Willett, then somewhat active in political affairs, had opposed Cassidy's leadership and had written and caused to be circulated a letter in the following language:

"I notice that Joseph Cassidy, one of the candidates for borough president of the borough of Queens, has placarded the entire borough with posters containing his picture and under which is the following: 'Foresight, capacity, energy, brains and ability to accomplish results.' Although this candidate unquestionably possesses these qualifications, I have never known him to use these traits of character in the interest of any one but himself; and I also wish to state, basing my judgment upon personal dealings with Mr. Cassidy, extending over several years, and personal knowledge of his conduct with other men, I am fully convinced that where his personal interest is at stake, he will break every promise, violate every pledge, no matter how sacredly given, and sacrifice every friendship. And it is my profound judgment that his candidacy is a menace to the prosperity of the borough of Queens.

"Respectfully, [Signed] Wm. Willett, Jr."

[2] The relations between Willett and Cassidy were then, and, so far as the evidence discloses, continued to be hostile. There is no evidence that Willett's opinion had been changed. Walter had at one time affiliated with the Republican party. Some years before, he had transferred his allegiance to the Democratic party, and had become an avowed supporter of Cassidy, and, during the latter's incumbency of the office of president of the borough of Queens, had obtained several valuable contracts for the performance of public work. He was also a client and personal friend of Willett. Cassidy was not only chairman of the Democratic county committee, but the evidence establishes that his power was so absolute that neither Willett nor any other aspirant for the nomination, two of whom were called as witnesses, thought it necessary nor in fact did they consult with any other person, delegate, or otherwise, respecting the same, except that one of them asked Walter to see Cassidy in his behalf, as did also Willett. Even when one of the four assembly districts in Queens county was carried by the faction hostile to Cassidy's leadership, the fact that no delegate to the judiciary convention from that district was elected, according to his own admissions, was due in part to his efforts.

The evidence fully establishes that the nomination was so completely in his control that he could give it to whom he would. On July 28, 1911, the Governor of this state approved a bill creating three additional offices of justice of the Supreme Court in the Second judicial district, which offices were to be filled at the general election to be held in the fall of that year. Five counties were comprised within the district, but the county of Kings elected a majority of all the delegates to the judiciary convention, and, if these unitedly determined so to do, could name all three of the candidates. It was the hope, which hope was afterwards realized, that Queens county, which was the second county in size in the district, would be permitted to name one. Shortly after this act became a law, Willett approached Walter, his friend and Cassidy's supporter, and asked him to interview Cassidy as to the possibility of his consideration of Willett as the candidate from Queens county. Cassidy's answer was significant: "It would be a smart thing to wait and see who won the primaries." The expectation was that there would be a sharp contest. Such was the case, and although Cassidy won in three out of the four assembly districts of the county of Queens, so that he was elected chairman of the county committee, the result at that time was not free from doubt.

On September 22, 1911, four days before the date of the primary election, Willett obtained upon his note, indorsed by his friend Frank R. Merrill, which note the latter caused to be discounted at his bank, the sum of $5,000. When Mr. Merrill was about to draw his check for the amount of the note, less the discount, Willett informed him that he not only wanted the exact amount of $5,000, but that he wanted it in large bills, and he thereupon gave Merrill his check for the amount of the discount. Merrill drew $5,000 from his bank in bills, some of the denomination of $1,000 and some of $500, and gave them to Willett. At that time Willett stated that he wished "the money to use for primaries, or as a contribution for the primary funds." Although the parties had several previous transactions, this was the first time that Willett had desired payment in cash rather than by check. On September 29th, three days before the date of the meeting of the assembly conventions, Willett borrowed upon two notes, one made by his wife to his order and the other by his brother and partner Marinus Willett, also to his order, and both indorsed by him, from the National Bank of Far Rockaway, the sum of $10,000. When Mr. Heyson, the president of the bank, was about to credit his account with the amount of these notes, less the discount, Willett again stated that he wanted the entire $10,000, and he wanted it in large bills. The bank at Far Rockaway did not have that amount of cash on hand, and Willett, having given to the bank his own check for the amount of the discount, received from the president thereof a check for $10,000 upon its correspondent in the borough of Manhattan, the Seaboard National Bank. Walter was in Willett's company at that time, and together they went to this bank, when, after proper identification, $10,000 was paid to Willett at his request in cash and in large bills of the denomination of $1,000 each. It is but fair to say that Walter testified that, although he accompanied Willett to the bank in Manhattan,

he did not remain until the cash was actually paid to him. Be that as it may, Walter saw Willett again, either the same evening or the next morning, and admits that he then received from him $5,000 in cash. It is also true that Walter testified that the consideration for this was the transfer of two certificates of stock, one for 63 shares of the stock of the Automobile Building Company, and the other for 24 shares of stock of the Cabinet Land Company, and that he had executed the transfer of these certificates upon the train the day before, when in Willett's company. There was evidence in this case to justify a finding by the jury that the stock in each of these companies, originally given to Walter by Willett, was at that time of little value, and was known to both parties to be so, and that for some time Walter had been trying to induce Willett to take it from him. It also appears that at that time Willett was in almost daily communication with Cassidy.

On the afternoon of October 5th, the day before the meeting of the judiciary convention, Willett had an interview with Mr. Samuel R. Smith, the president of the Bank of Long Island, whose banking rooms were located at Jamaica, nearly opposite to Willett's law office. He asked him "if he could get $10,000; he said he thought he had a chance for the nomination to the Supreme Court, and he said it would take some money;" "that it took money to get the nomination;" that "he had to have the money in advance;" that "after the nomination a man had to sit up and look dignified"; that he needed it "for contributions," and that "whatever contributions he had to make would have to be made before the convention; that he could not make any contribution afterwards." It may be significant, in this connection, to note that both Smith and Heyson and Merrill were personal friends of Willett, although the testimony as to the purpose for which he desired to secure this money came very largely from their lips. The note given in connection with this loan was a note "with interest," so that no amount was deducted for discount. Willett was paid the entire face thereof, at his request, in cash, and again in large bills, mostly of the denomination of $1,000. Again Walter was present when this transaction was consummated, and immediately thereafter Walter and Willett took a short ride together in an automobile out into the country, returning about half an hour afterward, in time for Walter to take the train at Jamaica for Brooklyn, where the judiciary convention was to be held at noon. On the train he met Cassidy. Upon arriving at Brooklyn they went to a saloon or café together, and shortly thereafter Cassidy announced that he was "for Willett for justice of the Supreme Court."

There were only three delegates elected from Queens county, although the county was entitled to four. One of the other delegates was called in for a so-called conference between Walter and Cassidy. His complacency and Cassidy's power is evidenced by his statement that he never expressed his preference for a candidate, "because it was immaterial to me, as a delegate, who the leader selected at that time." The third delegate seems not to have been consulted at all. The choice of the Queens county delegates was communicatd by Cas-

sidy to the Kings county leader shortly before noon, and at the convention held at that hour Willett was nominated. Starting, then, with hostility between Cassidy and Willett prior to August, 1911, we find the former in the succeeding October at the last moment naming the latter as a candidate, although there is no evidence of public sentiment in his behalf, nor that he was generally considered as a candidate, to the exclusion of those who up to that time had been deemed to have substantial claims to preferment. What was the cause of this change of heart? Cassidy's first message was in reference to the "primaries." Willett's first borrowing was for "use at the primaries." It was not openly used in Cassidy's support. Up to that time Willett had been associated with his opponents. Nominally he continued to be so, although Cassidy said that secretly Willett was supporting him. But in what way? And in what way did Willett use the money obtained for primary purposes? Not a witness was called to whom admittedly any portion of this $5,000 was given by Willett. It is conceded that money was very essential to Cassidy in order to carry the primaries. The borrowing of $5,000 at this time by Willett in cash and in a way which would make it exceedingly difficult to trace his connection therewith is suggestive. It is significant also that on the morning of September 26th, the date upon which the primaries were held, $5,000 in bills was deposited to the credit of Cassidy's account in the Corn Exchange Bank, and upon the same day a substantially similar sum was drawn in small bills, also for "primary purposes."

We have, then, Willett, the aspirant, and Cassidy, the only man who could satisfy his aspiration. We have Willett obtaining $5,000 in cash for "primary purposes," and Cassidy, on the very day of the primary election, receiving $5,000 in cash and drawing a like amount to be employed for a similar purpose. To whom did Willett give the money, if not to Cassidy? The evidence, it is true, is circumstantial, but it is not a single but a combination of circumstances, all pointing in a single direction, and, unexplained, it would have justified the jury in finding a connection between the two. Cassidy sought to offer such explanation. Willett was not called as a witness on this trial. Cassidy testified that about the middle of September John C. Kennahan gave him $1,000 in cash, which he termed a "primary donation," and that, in the early part of September, David Gideon also made a like contribution of $1,000, and on September 22d Kennahan had a note for $2,500 discounted, and gave him the cash for that. Just why Cassidy should have carried around these large amounts of cash upon his person or in his pocket until the eventful morning of September 26th, and then deposited them, does not appear. It does not appear of what denomination the bills which he thus received were, but it does appear that the $5,000 which he deposited on that morning was too large for practical purposes in a primary contest, and had to be replaced by other bills of a smaller amount. It also appears from Cassidy's own testimony that, in addition to the sum deposited, he had at that time in his possession cash to a very large amount, nearly, if not quite, equal to the sums which he claims to have received from

other persons. John C. Kennahan was not called as a witness. There was evidence that he was ill. His son was called to substantiate Cassidy's testimony. From his testimony it would appear that there was something in connection with this alleged payment of $1,000 quite out of the ordinary, and apparently of a character which the parties thought necessary to conceal. The check upon which this money was drawn was made payable, not to Cassidy, but to the order of George H. Kennahan, and the money was drawn by him. The check was not one taken in regular order from John C. Kennahan's checkbook, but was a "loose check." At first the witness testified that, while taken from the checkbook, there was no entry upon the stub thereof showing what the payment was for. Afterward he thought that he obtained the "loose check" from the bank instead of from his checkbook, and, in answer to questions why he pursued this devious course in respect to this check, he attempted no explanation thereof. David Gideon, when called to the stand in defendant's behalf, testified that he gave Cassidy $1,000; that he did not "exactly know whether it was for primary campaign purposes." He was uncertain as to the time, as well as to the amount, and thought that it was a primary fund "because it was early in the year." He afterward added that it was early "of an election year," and he could not tell whether Cassidy was at that time "a candidate for any position." It was certainly for a jury to say whether this explanation was satisfactory. Tested by ordinary human experience, we cannot say that its conclusion that the explanation failed was not fully justified.

But the evidence went further. As we have observed, just before each of the important dates in that campaign, Willett obtained large sums of money, each time in cash, and on the last occasion, on the morning of the convention, when obtaining it, stated "that it took money to get the nomination," and that "he had to have the money in advance"; that "he needed it for contribution"; and that "whatever contribution he had to make he would have to make before the convention." If it took money to get the nomination, to whom was this to be paid? If the contribution was to be made in advance, who was likely to receive it? Clearly not some one who had no power to deliver the sought for prize. If Willett must make a contribution in advance, who would be more likely to receive it than the man who could blast his hopes or bring them to full realization? There was abundant opportunity in the ride into the country to transfer the "big bills" from Willett to Walter. There was abundant opportunity in the interview in the saloon to transfer at least a part of this from Walter to Cassidy, and immediately after this meeting Cassidy openly dictated Willett's nomination. Other deposits than that of the $5,000 above referred to were subsequently made by Cassidy in cash. Some of these were before and some shortly after the convention. It is true that these do not in the aggregate equal the amounts drawn by Willett, either just before the date of the assembly conventions or on the morning of the judiciary convention. But if not a cent of cash had been shown to enter Cassidy's bank account at that time, in view of the evidence as to the transactions just preceding the date of the primaries, in view of Willett's declared purpose of borrow-

ing the money both at that time and on the morning of the judiciary convention, in view of the previous relations of the parties, in view of the fact that, if the nomination must be bought, defendant was the only one who could sell it, in view of Cassidy's admissions that at this time he was carrying large sums of money in his pocket amounting to several thousand dollars, and in view of the subsequent conduct of the defendant with respect to the nomination, it was for the jury to say whether such nomination was made, tendered, or offered by him "upon the payment or contribution of any valuable consideration or upon an understanding or promise therefor."

We consider now the exception above referred to. Upon the trial of the action the facts and circumstances surrounding the borrowing by Willett of $5,000 from his friend Merrill were proved by the people. Upon cross-examination Merrill was asked:

"Q. Was this $5,000 note ever paid? A. Yes. Q. By Mr. Willett? A. I don't know. Q. When was it paid? A. The only way I can answer that is that it must have been paid at maturity, because I have never seen it since. * * * Q. And, after you had had it discounted in the bank, you never saw the note or never heard anything about it? A. No."

If this evidence was material at all, its purpose was to enable the jury to draw the inference that a portion of the amounts subsequently borrowed by Willett was used to discharge this obligation, which came due in the latter part of October, and thus to account for the same to that extent. The people were then allowed to prove, over defendant's objection and exception, and upon redirect examination, that this note was not thus paid; that Merrill's testimony that he had "never heard" of the note afterward was untrue; and by his testimony and that of other witnesses that he knew perfectly well that Merrill had given to Marinus Willett, a brother of William Willett, a certificate of stock for 50 shares of the Atchison, Topeka & Santa Fé Railroad Company, which he had sold, and with the proceeds of this sale the note had been paid to the knowledge of William Willett, and that at that time there was still owing to Merrill a portion of the sum obtained from the sale of the loaned stock. The evidence was properly received. When, upon the trial of an action, evidence is elicited on cross-examination, from which an inference as to a fact favorable to defendant may be drawn, subsequent evidence of other facts or circumstances, showing that the inference sought to be drawn is unwarranted, becomes competent and material. People v. Buchanan, 145 N. Y. 1, 24, 39 N. E. 846; People v. Zigouras, 163 N. Y. 250, 255, 57 N. E. 465.

The judgment of conviction should be affirmed. All concur.